My name is Norman Ronneberg and I'm appearing on behalf of the petitioner Eric Shine. This is not a tidy case, to say the very least. It has more issues than any case I've ever handled before on appeal. But there's one principle I'd like this court to remember as it is making its decision, and that is Eric Shine, like all merchant seamen, is a ward of this court. He is entitled from this court and the federal government, according to U.S. Supreme Court precedent, to heightened legal protections and is to be given the benefit of the doubt when he deals with the courts and with the government. This court said that in Jones v. Reagan just a few years ago, that when an amnesty statute or an amnesty law is to be applied, it's to be applied in the manner most favorable. Counsel, let me cut to the chase of what's troubling me in this case. The parties spend much of the time arguing about mental incompetence and privilege. And the statute that permits the revocation of license refers only to incompetence. It doesn't refer to mental or any other kind. And the regulation defining incompetence says it is the inability on the part of a person to perform required duties, whether due to professional deficiencies, physical disability, mental incapacity, or any combination thereof. And so my question fundamentally is the following. And I know you won't agree with this premise, but I want you to understand anyway, I want you to answer anyway. Your client's behavior was wholly unacceptable. He did a lot of things. He left the ships unprotected with the fire alarms. He turned on switches not knowing what they were, disrupted fire drills, was insubordinate, repeatedly did a whole lot of bad behavior. What difference does it make to our analysis whether he's mentally incompetent or merely professionally deficient? In other words, why do we, in view of his behavior, what difference does it make what his mental state is? Well, in view of his behavior, the only proof you have of that is one witness who testified at the ALJ hearing. But what you also have is you had a Coast Guard investigator who was supposed to be given particular deference who went on board that vessel, who talked to people on that vessel and found not only no misconduct and no safety-related activity that took place, but more importantly, per the CFRs and the governing statute, this investigator is not only supposed to look for misconduct and safety problems, but he's also supposed to look for incompetence. He found none of those things after the fact. But you're arguing with my question, and so it's not a you're welcome to do that. But it's not helping me figure out my concern, which is I want you to assume that he was, in fact, incompetent, that is, deficient in his performance in ways that affected safety. I need you to go with that as the premise of the question. If that is the case, why is it important to find out whether that repeated bad behavior that was not being addressed by him is the result of a mental illness or just he doesn't feel like going along with the program? What difference does it make? It only makes the difference because that is the only thing he was charged with by the Coast Guard. That was the template that he was given. According to the Coast Guard's own rules and regulations, the seaman defends against what is in the complaint. He was not charged with misconduct. He was not. He was charged with incompetence. That's right. He was not charged with the usual things that people are charged with when a suspension and revocation hearing is done. Well, that's not what I'm going by. He was charged, as I understood it, with incompetence, period. Yes. I just read to you the broad definition of incompetence. And so why wouldn't that encompass that whole definition if he's charged with incompetence? If he, in fact, did anything related to the safety of the vessel that amounted to something that put himself and his crew members in danger, that would be misconduct. That would not be incompetence. It would be incompetence under the definition we're working with, certainly. If he leaves a fire alarm off, if he refuses an order, if he throws a switch not knowing the source of the energy involved, that certainly places in serious question his competence, if you will, to be a ship, to be a merchant seaman on a vessel of this size in particular. If he, in fact, did do something that made that was unsafe for the vessel, that would be incompetence. I agree with you. But I'm just reminding you that an investigation was done by the Coast Guard that found nothing that was safety-related that took place. Well, I'm trying to understand if you agree or disagree with the following proposition. Yes. If a person in your client's position, leaving aside whether your client is in this position himself, is unprofessional, aggressive, violates safety regulations, is insubordinate, then that counts as incompetence regardless of the mental state that accompanies that behavior. Insubordinate, I'm not so sure about, mainly because if you look at the U.S. Supreme Court cases on what makes a seaman seaworthy, you basically have to have a savage and violent nature. And that case is only 20 years old. So as far as everything, incompetence stems from safety-related problems. Okay. Let's go back. Let's go back. So if someone repeatedly does unsafe behaviors and won't stop and keeps doing them, does that count as incompetence regardless of the mental state that accompanies the behavior? Yes. I would agree with you there. Okay. But I would also state that the only proof that we have was contradicted in two ways. One was contradicted by the Coast Guard's own after-the-fact investigation where they sent an independent investigator on board who interviewed witnesses, who talked to people and said, this is a labor dispute. He said, there are no safety-related problems here. And he was also tasked per the investigation. But that was early. That was early, and for lack of a better way of putting it, the matter. There ensued, did there not, as a result of those initial contacts, an investigation into your client's stability. Let's use that word. Right. Thereafter, the factual picture emerged quite differently. Did it not? No, it did not. Remember that the only way that you are able to, that the Coast Guard is allowed to bring charges and to prefer charges here is when there is an act of incompetence relating to the operation of the vessel. The last vessel he was on was the President Jackson. It was after the President Jackson that the investigation took place and the investigator went on board and he said, there are no safety-related violations here. I've investigated this. There are no safety violations. Now, the Coast Guard prosecutor, however, to be blunt, had him add-on against this seaman. As is evidenced by the document and the e-mail that we had to get through FOIA that was not produced to us, which basically says, oh, darn. He found that there was no misconduct, no negligence, and no violations of 33 or 46 USC. But, you know what? I think we will be able to frame this in such a way that we find something on the guy. This is long after. This is months and months after he left the ship. And months and months after, he was found to have committed, you know, nothing that was a safety-related violation. So just from a factual standpoint, you know, they offered only two examples. One, the Maui, where essentially he had another labor dispute, which the owner of the vessel acknowledged. And they said that he was. difficult to work with, didn't focus on his job, refused to report to work at various times. I'm not sure why that doesn't count as more than a labor dispute. Well, what Mr. Ray said was exactly that. But he also said there was only one potential safety-related problem here, and that was the failure to turn to and show up at a time when this gentleman had already left the vessel, had been signed off that particular vessel. What's most important here are two things. One, the company, Matson, did not stand behind Ray. It rescinded all of his discipline and said, this is a labor issue. But secondarily, and what is incredibly important here from an American law perspective, if you do anything unsafe per statute, and we cited the statute, it goes into the ship's log. Nothing went into the ship's log here. The Coast Guard uses that ship's log as a prosecutorial device. It's a very important document. The ship's log said nothing about any safety-related issue. So the Maui, both because Matson didn't stand behind Mr. Ray, and secondarily, there was no entry in the ship's log, the Maui, as far as I'm concerned, offers no evidence whatsoever. Secondarily, the Coast Guard, on the present Jackson, the only other vessel involved, the Coast Guard's own investigation ended up saying there was no safety-related violation here, no act of incompetence. Well, in reviewing the record here, we can only reverse if the record compels us to do so. And the ALJ looked at the Coast Guard findings and said, despite that, I think these acts do relate to safety violations. And so I take it that your argument is that that's not well supported in light of the Coast Guard's finding. Is that right? That's one of the arguments, yes. In addition, the fact is that the courts are supposed to be deferential to the ALJ's factual findings unless they're not in accordance with law. And essentially, the only things that you're allowed to look at are those things, those violations that are pertaining to acts of incompetence that take place relating to the operation of the vessel. Not anything afterwards, not anything before, but with regards to the operation of the vessel. And the instance of the seaman not following an order, the ship was in port, he was no longer on duty, he was no longer even under articles, that's not exactly in the operation of the vessel. So if you have the law which defines when a seaman is working and what he's supposed to be doing, he's not operating a vessel at that time. So you're beyond the statute and it's not in accordance with the law. So your position is that given what we know about this gentleman, he should be credentialed and returned to service? Yes, it is, Your Honor. What you know of this gentleman comes from the ALJ hearing. There's no question about that. He had a stellar credentials and history before this. He had had no significant discipline of any sort. He was a graduate of the Merchant Marine Academy. He'd been found fit for duty psychiatrically hundreds of times. Every time you go on board a vessel, you present a fit for duty slip which relates not only to your physical but your mental condition. The Coast Guard conceded that in his most recent annual exam, he'd also been found psychiatrically fit. So this is such an anomaly. If you look at the history of seamen and the ALJ cases in the past, nobody has ever been found to be mentally incompetent based on some condition where there's not been a vessel casualty or violation of statute. You're down to about a minute if you'd like to save it.  Thank you. Thank you. Thank you. May it please the Court. I'm Robert Kamenschein representing the Coast Guard here. Let me just say at the outset that certainly we agree that this is a very serious matter. It's a serious matter from the perspective of Mr. Shine, whose livelihood is involved here. But it's also a serious matter for the Coast Guard, which has the mission of protecting safety, maritime safety. And this case has consumed a tremendous amount of effort and time at three levels, an exhaustive hearing, a review by the Vice Commandant. And it's significant, I think, that the Vice Commandant initially reversed a decision and held in favor of Mr. Shine, remanded for a full-scale hearing. And then ultimately by a completely independent agency, not a part of the Department of the NTSB. And the NTSB reviewed all this and agreed with the revocation. And quoting from the NTSB's decision and putting aside, as this Court's questions indicate, the mental aspects of the case, the NTSB said that Mr. Shine, quote, engaged in disruptive, erratic, and sometimes dangerous behavior aboard the Maui and the President Jackson. What do we do with the fact, as counsel argued, that on the S.S. Maui, because the acts were not recorded in the logbook, there's really no force to those allegations. And with regard to the last ship that he was on, which is the President Jackson ship, the Coast Guard's own findings contradict what the ALJ ultimately found in this case, which is, number one, whether there's been any misconduct, and number two, whether they related to safety violations. How do we reconcile those findings with the ALJ's ultimate conclusions in this case? I think your questions reflect points counsel is making that I think misdirect the inquiry, because in the first place, this is not a misconduct case. And so a finding of no misconduct is not the equivalent of acts of incompetence. And then with respect to safety, the statute talks about incompetence relating to the operation of the vessel. That's the current statute, by the way, not the statute that existed pre-2004. But even under the current statute, it has to relate to the operation of the vessel. It's not necessarily that what was done created an immediate safety hazard, although I think it did in a couple of the instances with the fire alarm. The question is, the Coast Guard looks at these acts and says, what is the – these reflect incompetence, which could affect safety at a future date. Do we want this person in that particular capacity? He may be well suited for lots of things on shore, but the narrow judgment here is whether this person should be in that capacity on the ship. And the Coast Guard is afraid that this – these acts suggest that this person poses too much of a risk in those future situations. So the Coast Guard is not supposed to wait until the actual threat to safety occurs, but to look at these situations and say, does this pose a threat in the future? Similarly, whether the ship is out on the water or out on the high seas or the ship is tied up at the dock, really there's nothing in the statute about that. And certainly acts relating to the operation of the vessel could occur while the ship is tied up and moored at the dock as well as it's out – while it's out on the sea. There are responsibilities that have to be fulfilled at that point, and they could reflect adversely on the competence of the individual. So that, again, we – Mr. Schein has received very full and conscientious consideration. These are judgment calls that are unpleasant to have to make because, as we said, they do involve somebody's likelihood. The people involved made those judgments to the best of their ability. The NTSB reviewed this and didn't just give it a one-sentence affirmance, but wrote a fairly comprehensive evaluation of what occurred within the Coast Guard proceedings and came to the conclusion that this was the appropriate result. We think that there's ample reason, given that record, for the Court to sustain the well-considered judgment of the Coast Guard as affirmed by the NTSB that allowing Mr. Schein to continue in a shipboard capacity unrelated to anything else would pose an unacceptable safety risk. May I digress for a second and ask you a question? Yes, sir. What are Mr. – assuming we were to agree with you that what has been done has a sound basis, what are Mr. Schein's alternatives for the future? Well, Your Honor, here we are in 2013. Within the industry, of course. Or 2014, I should say. I'm not up to date. Here we are in 2014. The revocation of that certificate does not mean that he could never obtain a certificate. If he were to present for – go back to the Coast Guard, reapply for a certificate, put in new evidence, make a new record with regard to his circumstances, what's happened since then, medical evaluations, et cetera, that would be a new, in a sense, a new ballgame that would have to be considered. And who knows what the outcome would be. But, of course, that's not where we are. Has the certificate actually been revoked all this time? Yes, it has. So it's since, what, 2008, am I right? I'm mistaken, apparently. Earlier. It was earlier. Okay. Several years ago. Right. And so we don't have a record of what has happened right up to today's hearing or how that might affect things in the future. Does the Coast Guard – has the Coast Guard altered its policy with respect to the subpoenaing of medical records after Jaffe? No, Your Honor, it hasn't. So it continues to issue subpoenas for such materials. Right. Right, Your Honor. However, as we point out in our brief, the mental and physical fitness of a person in the merchant service is central to what the Coast Guard does, to its mission. And so to fence all that out and say it can't be looked at would undercut that central mission. So the Coast Guard interprets its regulation stating that there's no physician patient privilege to continue to cover the psychotherapist patient privilege. Right. Right, Your Honor, because if it didn't interpret it that way, mental and physical fitness is at issue from the day the person applies for a certificate. One is equally important as the other. It wouldn't make sense if you're trying to ensure safety to look at only the physical dimension and to exclude the mental. Well, of course, but you have alternatives, do you not, beyond this subpoenaing the confidential records of defense? Well, Your Honor, no. And, indeed, you had them here. There was some behavior that some people described as threatening and bizarre. Right. That certainly brought into issue the question of his continuing competence. Granted, he declined to be to submit to an examination himself, which may explain a number of things, but it's not that you have to rely solely on the confidential records of a personal therapist. No, that's correct, Your Honor. Although I think it is critical here that, and we understand that there were objections, but the Coast Guard wanted Mr. Shine to be evaluated by someone, well, someone designated by the ALJ. And Mr. Shine declined to do that, so there was an opportunity to have an assessment made right there and then. And that failure to cooperate was itself significant in the Coast Guard's thinking. Of course, by that time you had already subpoenaed the records. Correct. If the Court has no further questions. I don't believe that we do. Thank you. Thank you. Well, first of all, Your Honors, it has been 14 years since the Coast Guard took Mr. Shine's license. Fourteen years where people have sat on this case. It took like three years to get one ruling and a year to get another ruling. He has not been able to work at his chosen occupation. One of the things I think that is really important is that, and we haven't discussed until now, is due process. And the reason that's important is that here you had a benefit that already existed taken away. Under the Goldberg v. Kelly case, you owe heightened due process protection when you take it. And Mr. Shine's cases and whatnot are part of due process. He had notice and he had a hearing, which is what Goldberg required. Yes. What is your response to counsel's statement that if his situation has changed, he can reapply now, separate from this case, and simply start on a clean slate? Well, first of all, there is no clean slate. I handled the case Klatt v. United States 20 years ago, again with Mr. Cameron Shine, where this court basically said that it referred to the disciplinary record that the Coast Guard has. Every blot, every little blot, even an admonishment, which is all that was considered by this court, was held to be incredibly important because it is used to enhance any future problems. If you have anything as serious as losing your license, having it revoked, I guarantee you, I guarantee you there is no way in the world this man would ever get his license back. That is not something, given the Coast Guard's disciplinary procedure, something that would never happen. As far as the right to subpoena, which the Coast Guard seemingly believes that the  you are just about out of time. And if you could summarize your final point. Okay. I guess the only issue, I guess the key issue here is things to remember. Mr. Shine asked the ALJ, who has subpoenaed my records? And he was told it was none of his business. He asked the ALJ, please send this to an Article III judge to determine whether or not I have any psychotherapist privilege here. He was told no. He asked if he could cross-examine the witnesses that were going to be used against him. He was told that yes, he could. And then when the time came, he was told no, he couldn't. It was a gotcha situation. Crucial evidence was used against him, which he had no opportunity to cross-examine. Thank you, counsel. Thank you. We appreciate the arguments of both counsel in this very interesting case, which is now submitted. And we will stand adjourned for this morning's session.
judges: Dearie, Graber, Nguyen